# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FONTELL DEMANN FULLER,                    Case No. 19-CV-0886 (PJS/BRT)

          Plaintiff,

v.                                                  ORDER

STANLEY HAFOKA; DEVIN
SULLIVAN; ROB ERICKSON; AHMED
DUALEH; JANET SNYDER; TAYLOR
KUSESKE; and STEVEN ROUTHE,

          Defendants.

Fontell Demann Fuller, pro se.

Kimberly R. Parker and Robert B. Roche, RAMSEY COUNTY
ATTORNEY'S OFFICE, for defendants.

In September 2016, plaintiff Fontell Demann Fuller was charged with being a felon in possession of a firearm and detained pending trial at the Ramsey County Adult Detention Center ("ADC"). Fuller was later injured at the ADC when a correctional officer used a chokehold to take him to the ground and, together with two other correctional officers, handcuffed him. Fuller brought this pro se action against the correctional officers and other ADC employees, asserting numerous claims under 42 U.S.C. § 1983 and Minnesota state law, including claims for excessive force, failure to intervene, conspiracy to violate his civil rights, deliberate indifference to a serious medical need, and unconstitutional conditions of confinement.

This matter is before the Court on the parties' cross-motions for summary judgment and on Fuller's motions for recusal[1] and for "spoliation and perjury."  For the reasons that follow, defendants' motion for summary judgment is granted in part and denied in part and Fuller's motions are denied.  The Court dismisses all of Fuller's claims, save for one of his excessive-force claims.  That claim will have to be tried.

## I.  BACKGROUND[2]

### A.  Fuller's Detention in the ADC

Fuller was booked into the ADC on September 5, 2016, as a pretrial detainee. Davy Aff. ¶ 3 & Ex. A.  Fuller was placed in the general population until January 12, 2017, when he was transferred to the St. Peter Regional Treatment Center for a psychiatric evaluation.  *Id.* ¶¶ 4–5 & Ex. B.  Fuller returned to ADC's general population on February 14, 2017.  *Id.* ¶ 5 & Ex. B.  Three days later, Fuller was placed in disciplinary segregation after he disobeyed orders and refused to comply with a security procedure.

---

[1]Fuller has renewed his motion to recuse the undersigned and Magistrate Judge Becky R. Thorson.  ECF No. 148.  Fuller's motion is based on his disagreement with previous decisions made by the undersigned and Judge Thorson.  As the Court has already explained to Fuller, the fact that a litigant disagrees with a judge is not grounds for the judge's recusal.  *See* ECF Nos. 111, 117.  Fuller's motion to recuse is therefore denied.

[2]Fuller filed additional exhibits the day before the hearing, ECF Nos. 162, 163, and filed yet more exhibits several days after the hearing, ECF No. 169.  These exhibits were filed in violation of the Local Rules, and defendants did not have a fair opportunity to respond to them.  Therefore, the Court has not considered these exhibits in ruling on the pending motions.

*Id.*; Schwab Aff. ¶¶ 13–14 & Ex. A; Walker Aff. ¶¶ 3–4 & Ex. A (noting a disciplinary hearing for this incident was held on February 19, 2017).  In disciplinary segregation, detainees are given one hour per day out of their cells.  Davy Aff. ¶ 7.  On February 20, 2017, Fuller was moved to administrative segregation, which houses detainees with special needs and detainees who are nearing the end of a term in disciplinary segregation.  *Id.* ¶¶ 8, 10.  In administrative segregation, detainees can earn up to three hours per day out of their cells.  *Id.* ¶ 8.

### B.  *The April 14, 2017 Incident*

On the morning of April 14, 2017, Fuller was out of his cell in the glassed-in recreation area in the administrative-segregation unit.  Kuseske Aff. ¶ 3.  At approximately 8:10 am, Fuller pressed the panic button, which connected him to the control room, where Officer Taylor Kuseske was working.  *Id.* ¶¶ 3–5; Dualeh Aff. ¶¶ 4–5.  Fuller demanded that a correctional officer retrieve several items for him. Kuseske Aff. ¶ 5; Dualeh Aff. ¶ 5; Routhe Aff. Ex. E at 3:39–4:22.  Officer Ahmed Dualeh retrieved all of the items that Fuller requested, except for Fuller's legal papers.  Dualeh Aff. ¶ 6.  Officer Dualeh explained that Fuller would need to make a formal written request in order to receive his legal papers from the property room.  *Id.*; Routhe Aff. Ex. E at 3:39–4:54.

Fuller continued to press the panic button and continued to demand that Officer Kuseske retrieve items for him. Dualeh Aff. ¶ 7; Kuseske Aff. ¶ 6. According to Officer Kuseske, Fuller became argumentative. Kuseske Aff. ¶ 7 & Ex. A. At some point, Officer Kuseske instructed Fuller to return to (or "lock into") his cell, but Fuller refused. Dualeh Aff. ¶ 8. Officer Kuseske then called for assistance in getting Fuller back to his cell. Kuseske Aff. ¶ 7; Routhe Aff. Ex. E at 4:58–5:20.

After receiving Officer Kuseske's call, Officer Stanley Hafoka walked over to Fuller. Hafoka Aff. ¶ 4. Fuller again requested his legal papers, and apparently accused the ADC of stealing them; Officer Hafoka told Fuller that he would have to wait to get his legal papers, and Officer Hafoka again directed Fuller to return to his cell. Dualeh Aff. ¶ 9; Routhe Aff. Ex. E at 5:33–6:14. Officers Dualeh and Janet Snyder arrived during this conversation. Davy Aff. Ex. D at 8:14:09.086–8:14:16.736. Fuller was "frustrated," but nevertheless began to walk towards his cell, and Officers Hafoka, Dualeh, and Snyder followed behind him, in that order. *Id.* at 8:15:05.323–8:15:08.973; Routhe Aff. Ex. E at 6:15–6:22; Dualeh Aff. ¶ 10; Hafoka Aff. ¶ 5; Kuseske Aff. ¶ 8. Fuller stopped at a table, picked up some papers or paper towels[3] and a hygiene kit,[4]

---

[3]It is unclear whether Fuller picked up papers, paper towels, or both. *Compare* Hafoka Aff. ¶ 6 ("papers"), *and* ECF No. 151 at 3 ("paper"), *with* ECF No. 7 at 5 ("paper towels"), *and* ECF No. 158 at 2 ("paper and paper towl [sic]"). At the hearing, Fuller said that he picked up both papers and paper towels. In addition, the officers stated that Fuller also picked up a pencil. Hafoka Aff. ¶ 6 & Ex. A; Dualeh Aff. ¶ 11 & Ex. A.

(continued...)

and headed down a hallway toward his cell.  Hafoka Aff. ¶ 6; Davy Aff. Ex. D

at 8:15:08.973.

The parties dispute what occurred next.  On a motion for summary judgment,

however, the Court must take the non-movant's version of events as true unless it is

"blatantly contradicted by the record."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  With

that in mind, the Court first considers Fuller's account.[5]

---

[3](...continued)
Fuller does not mention picking up a pencil.

[4]A hygiene kit is a plastic bag that contains deodorant, toothpaste, and a toothbrush.  Hafoka Aff. ¶ 6.

[5]In their reply brief, defendants argue that the factual allegations in Fuller's briefs were not backed by admissible evidence because Fuller did not file an affidavit attesting that all of the factual assertions that he made in his briefs were true.  At the hearing, the Court concluded over defendants' objection that it had the discretion to allow Fuller—a pro se litigant—to remedy the oversight by filing an affidavit.  Fuller thereafter filed an affidavit (and then an amended affidavit).  ECF Nos. 165, 166.  The amended affidavit states:  "I Fontell Fuller being duly sworn under oath and affirmation state the following is true and factual. . . . The Plaintiff swears under oath and affirmation that the Motion for Summary Judgment . . . along with the two Memorandums . . . are absolutely true and correct and factual based upon laws, evidence, and personal knowledge 'So Help Me GOD'."  ECF No. 166 at 1.

Although Fuller styles his filings as sworn affidavits, they are not sealed by a notary public.  As a result, they are technically unsworn declarations.  *See Schneider v. Chertoff*, 245 F.R.D. 422, 424 (D. Neb. 2007).  Under 28 U.S.C. § 1746(2), an unsworn declaration is admissible if the declarant (1) states "under penalty of perjury that the foregoing is true and correct," (2) dates the declaration, and (3) signs the declaration.  Fuller's filings are signed and dated, but neither affidavit says that it was made under "penalty of perjury."

(continued...)

1.  Fuller's Version

According to Fuller, as he left the table and started walking towards his cell, he

threw his hygiene kit on the ground out of frustration.  Routhe Aff. Ex. E at 6:24–6:32.

None of the officers warned Fuller to stop throwing items.  ECF No. 151 at 6.  Fuller

then walked down the hallway and, just before he reached the door to his cell (which

was at the end of the hallway on Fuller's right), Fuller threw the papers or paper towels

_____

[5](...continued)
The Court will not hold this oversight against Fuller.  At the hearing, the
undersigned advised Fuller that he could file an affidavit stating that the statements
were either true "So help me God" or made "under penalty of perjury."  The Court
neglected to tell Fuller that, if he chose the former option, he would have to sign his
affidavit in front of a notary public.  Fuller did choose the former option, and he
followed the Court's (admittedly incomplete) direction.

Fuller thus did not fully comply with § 1746, but the Court will nevertheless
accept Fuller's affidavits.  First, defendants did not object to their content, though they
had ample opportunity to do so.  Second, almost all of the material factual assertions in
Fuller's briefs are based on his personal knowledge and would be admissible at trial
through his testimony.  *Cf. Oglesby v. Lesan*, 929 F.3d 526, 534 (8th Cir. 2019) (finding
district court did not abuse its discretion in admitting defendant's improperly
authenticated documents on summary judgment when plaintiff made "no showing that
these documents *could not* be presented at trial in an admissible form"); *Walker v. Wayne
County*, 850 F.2d 433, 435 (8th Cir. 1988) (finding district court's reliance on inadmissible
double hearsay "not misplaced" when plaintiffs "have personal knowledge of the
events" and "their version of those events [would] be admissible at trial through
[plaintiffs'] personal testimony").

Even if the Court did not consider the affidavits, the video of the incident and the
audio recording of the disciplinary hearing largely corroborate Fuller's version of
events and are sufficient to support the Court's denial of defendants' motion for
summary judgment on Fuller's excessive-force claim against Officer Hafoka.

that he was carrying at the wall directly in front of him.  Routhe Aff. Ex. E at 6:32–6:42.

None of the officers gave any verbal commands to Fuller, such as by telling him to calm

down or pick up the items or get on the ground.  *See id.* at 8:00–8:38; ECF No. 151 at 5.

Instead, Officer Hafoka came up suddenly from behind, and without warning,

put Fuller in a chokehold, pulled him backwards, slammed him onto the concrete floor,

and landed awkwardly on top of him.  Routhe Aff. Ex. E at 6:45–7:29.  Fuller heard a

"loud pop" and "automatically [he] knew" that his ankle was injured.  *Id.* at 7:30–7:39.

While Fuller was on the ground, Officer Hafoka restrained him in a chokehold for

30 seconds; during those 30 seconds, Fuller was unable to breathe.  *Id.* at 7:56–8:01; ECF

No. 151 at 14–15.

In sum, Fuller concedes that he was "angry" and that he threw things.  Routhe

Aff. Ex. E at 8:39–8:50 ("Yes, I was angry.  Yes, I threw the hygiene kit down on the

floor.  And yes, I threw the paper towel at the wall in front of me and not in his

direction . . . .").  But Fuller insists that he never verbally or physically threatened

Officer Hafoka, never violently swung his arms, and complied with the last directive he

received—which was the directive to return to his cell.  *Id.* at 8:37–8:38 ("I did not

assault him."); *id.* at 9:35–9:38 (denying that he swung his arms violently); *id.*

at 9:57–10:03 ("I didn't touch him, there was no threat to him, there was no assault to

him.  He assaulted me."); *id.* at 10:27–10:33 ("I didn't say anything threatening to him, and I didn't do anything physically . . . .").

### 2.  Defendants' Version

Defendants paint a different picture, identifying four key events that occurred before the takedown (although defendants are neither clear nor consistent in describing the order of these events).  First, after grabbing the items from the table, Fuller angrily walked away from the officers, swinging his arms violently.  Dualeh Aff. ¶ 11; Snyder Aff. ¶ 6; Kuseske ¶ 8.  Fuller was highly agitated; he breathed heavily, raised his voice, and continued to argue while walking to his cell.[6]  Dualeh Aff. ¶ 11; Hafoka Aff. ¶¶ 5, 7. Second, Fuller threw his personal items.  Hafoka Aff. ¶ 7 & Ex. A.  Third, Officer Hafoka warned Fuller to stop throwing things.  *Id.* ¶ 7 & Ex. A.  And fourth, Fuller "squared off toward [Officer Hafoka] with his arms in the air and fists clenched."  *Id.* ¶ 9.  Thereafter, defendants say, Officer Hafoka took Fuller to the ground to gain control. *Id.* ¶ 7 & Ex. A.  While he was on the ground, Fuller "resist[ed] all directives," and thus Officer Hafoka continued to attempt to restrain him.  *Id.* ¶ 7; *see also id.* Ex. A; Dualeh Aff. ¶ 13 & Ex. A; Snyder Aff. ¶ 7.  Officer Dualeh handcuffed Fuller, Dualeh Aff. ¶ 13, and Officer Snyder assisted Officer Dualeh, Snyder Aff. ¶ 7.

---

[6]Officer Snyder's affidavit does not mention Fuller breathing heavily or arguing while walking.  *See* Snyder Aff. ¶¶ 4–6.

As noted, there are some inconsistencies in defendants' accounts.  First, it is unclear when exactly defendants claim that Fuller turned around and "squared off" with Officer Hafoka.  Officer Hafoka's affidavit indicates that Fuller turned *before* he threw his personal belongings.  Hafoka Aff. ¶ 7 ("At one point, Plaintiff turned toward me with his arms raised and his fists clenched and threw the items in his hands.").  Officer Hafoka's incident report states that Fuller turned *after* throwing his personal items.  *Id*. Ex. A ("As Fuller got to his cell door he stopped[,] threw whatever items he had left in his hands[,] and turn[ed] towards me.").  And none of the affidavits and incident reports from the other officers mention Fuller turning toward Officer Hafoka; that is a claim that only Officer Hafoka makes.  Defendants' attorneys do not acknowledge these inconsistencies; instead, they simply contend in their brief that Fuller turned to face Officer Hafoka, turned back around, and then threw the items.  ECF No. 124 at 7.

It is also unclear when Officer Hafoka warned Fuller to stop throwing things.  *Compare* Hafoka Aff. ¶ 7 (stating warning occurred "[a]t one point" during the incident), *with id*. Ex. A (stating the warning occurred after Fuller "started throwing the items" and before the takedown).  And, once again, none of the affidavits or incident reports from the other officers mention such a warning; this is another claim that only Officer Hafoka makes.

3.  The Video

Fuller's encounter with Officer Hafoka and the other correctional officers was captured on video by a security camera.  The video is not great; it is shot at a distance, at low resolution, and through security glass (which reflects a lot of light).  Moreover, the security camera's view of the events is partially blocked by a staircase, pillars, a counter, two stacks of chairs, and a door.  But when the video is played at normal speed, it provides a fairly clear depiction of the encounter, and it largely supports Fuller's version of events.

The video is time stamped.  Fuller begins collecting his hygiene kit and papers or paper towels from the table at 8:15:08.973.  Davy Aff. Ex. D at 8:15:08.973–8:15:15.223. Fuller then walks away from the table and is obstructed from view by a pillar.  *Id.* at 8:15:15.223–8:15:17.073.  It appears that Fuller must have thrown his hygiene kit at this point, as he is not holding it as he emerges from behind the pillar.  *Id.* at 8:15:17.073– 8:15:18.473.  Fuller then continues walking down the hallway, holding papers in his left hand.  *Id.* at 8:15:18.473–8:15:22.723.  Officer Hafoka walks three or four feet behind him, followed by Officers Dualeh and Snyder.  Fuller is walking briskly and he looks agitated; at one point (right after he emerges from behind the pillar), he briefly raises his right hand above his head.  *Id.* at 8:15:18.873.

-10-

Fuller approaches the end of the hallway, where his cell is located.  *Id.*
at 8:15:22.523.  Just before reaching his cell door (which is to Fuller's right), Fuller
appears to use his right hand to grab the papers from his left hand and fling them
against the wall directly in front of him, using a backhand motion.  *Id.* at 8:15.22.923—
8:15:23.723.  (Fuller confirmed at oral argument that this is exactly what he did.)  At no
time does Fuller turn toward the trailing officers or physically threaten them.  Officer
Hafoka then quickly closes in on Fuller and, while Fuller is facing directly away from
him, Officer Hafoka grabs him from behind and takes him to the ground.

Defendants claim, however, that the video does not depict what it appears to
depict when played at a normal speed.  Instead, defendants say, if the video is paused
and the single frame that appears at 8:15:23.323 is closely examined, Fuller can be seen
directly facing Officer Hafoka with both hands raised above his head in a threatening
manner.

Defendants' argument illustrates why the Eighth Circuit has cautioned against
viewing a video of a use-of-force incident solely in slow motion or frame-by-frame.  *See
Dooley v. Tharp*, 856 F.3d 1177, 1182–83 (8th Cir. 2017).  As is usually true with a single
frame of a low-resolution video, the frame cited by defendants is fuzzy, and it is
difficult to make out exactly what it depicts.  But the frame cannot possibly depict what
defendants claim it depicts.

In the frame that immediately precedes the frame cited by defendants, Fuller appears to be faced away from Officer Hafoka with his torso turned slightly to the right. Davy Aff. Ex. D at 8:15:23.123.  In the frame that immediately follows the frame cited by defendants, Fuller is faced directly away from Officer Hafoka, having just thrown the papers at the wall.  *Id.* at 8:15:23.523.  On defendants' interpretation of the video, then, Fuller (who, as noted, had been briskly walking down the hallway) (1) stopped on a dime; (2) turned 180 degrees (or more) toward Officer Hafoka; (3) threateningly raised both of his hands above his head; (4) turned another 180 degrees (or more) away from Officer Hafoka; and (5) flung the papers at the wall—*all in four-tenths of a second* (from 8:15:23.123 to 8:15:23.523).  This is literally impossible; it is simply beyond the capacity of any human being.  In short, defendants' contention that Fuller turned to face Officer Hafoka with raised arms is (1) not seen on the video when the video is played at normal speed; (2) not supported by the video even when the video is examined frame-by-frame; and (3) not corroborated by any other evidence in the record, save for Officer Hafoka's affidavit and incident report, which are inconsistent with each other.

As noted, when the frame cited by defendants (that is, the frame that appears at 8:15:23.323) is examined in isolation, it is difficult to identify exactly what it depicts.  But when the frame is instead examined in the context of the frames that precede and follow it, the frame appears to capture Fuller in the middle of his throwing motion.  Fuller

appears to have pivoted his torso toward his left, somewhat like a left-handed pitcher beginning his throwing motion. But unlike a left-handed pitcher, Fuller is not preparing to throw with his left hand. Instead, he is transferring the papers from his raised left hand to his raised right hand, just before he uses his right arm to backhand the papers against the wall in front of him. *Id.* at 8:15:23.123–8:15:23.523. The Court's interpretation of the video may be mistaken, but, unlike defendants' interpretation, the Court's interpretation is physically possible, withstands scrutiny when each frame is viewed in isolation, and is consistent with what is seen when the video is watched in real time. The Court's interpretation is also entirely consistent with Fuller's account of his actions.

The video relatively clearly depicts what happened *after* Fuller threw the papers. Officer Hafoka quickly strides towards Fuller, who is facing toward the wall (and thus directly away from Officer Hafoka). *Id.* at 8:15:23.923. Officer Hafoka reaches out and wraps his right arm around Fuller's neck or shoulders. *Id.* at 8:15:24.123–8:15:24.523. Officer Hafoka pulls Fuller backwards, towards the ground. *Id.* at 8:15:24.523–8:15:24.923. The two men twist as they fall, and Officer Hafoka lands on top of Fuller. *Id.* at 8:15:25.123–8:15:25.973. When Officer Hafoka starts to take Fuller down, Officer Dualeh is several feet behind Officer Hafoka, and Officer Snyder is several feet behind Officer Dualeh. *Id.* Officer Dualeh approaches after the takedown has already begun,

*id.* at 8:15:25.573, and Officer Snyder approaches after the takedown is complete, *id.*

at 8:15:27.173.  The entire takedown occurs in less than 2 seconds.

After Officer Hafoka takes Fuller to the ground, the two are largely obstructed

from view, but they are clearly engaging in a physical struggle.  *Id.* at 8:15:25.973–

8:15:49.817.  For at least part of the time—from 8:15:45.167 to 8:15:45.967—Officer

Hafoka's arm appears to be wrapped around Fuller's neck in a chokehold, although the

video is unclear.  Officers Dualeh and Snyder assist Officer Hafoka in restraining Fuller.

*Id.* at 8:15:25.973–8:16:47.306.  Officer Snyder holds Fuller's legs at one point, and

Officers Dualeh and Hafoka handcuff Fuller.  *Id.*  Fuller is on the ground for about a

minute and a half before he is lifted to his feet by Officers Hafoka and Dualeh.  *Id.*

at 8:15:25.773–8:16:49.306.

### 4.  Fuller's Allegation that the Video Was Altered

As the Court has described, the video of the encounter between Fuller and

Officer Hafoka largely supports Fuller's version of events.  At no point does the video

contradict anything that Fuller says, and the video corroborates Fuller's account in

many respects.  The video is Fuller's best evidence.

Oddly, though, Fuller adamantly insists that this video—a video that strongly

*supports* his case—is a fake.  Specifically, Fuller alleges that defendants altered the video

in a number of respects, and cites the following alleged problems with the video in

-14-

support of his allegation: (1) the frame at 8:15:23.323 shows Fuller facing Officer Hafoka (just as defendants allege), even though Fuller never did so; (2) from 8:15:23.523 to 8:15:24.523, the papers are not consistently in view after Fuller throws them at the wall; (3) a "Sheriff" wearing a hat and jacket suddenly appears in the hallway between 8:15:45.367 and 8:16:34.358, replacing Officer Snyder for a few frames; and (4) Officer Hafoka is wearing a jacket in the video, but he was not wearing a jacket on the day of the incident.

As the Court explained at great length to Fuller during oral argument, the Court does not believe that the video has been altered, nor that a reasonable jury could find that the video has been altered. To briefly recap:

First, there are plausible explanations for all of the alleged problems with the video cited by Fuller. As the Court has explained, 8:15:23.323 does not show Fuller turning around and facing Officer Hafoka. Instead, it shows Fuller pivoting toward the camera and preparing to backhand the papers at the wall. In other words, this frame shows Fuller doing *exactly what he claims to have done*. Next, the fact that the papers were not in view for a few frames after Fuller threw them is explained by the security door that blocks the papers from the camera's view and by the fact that papers that are violently thrown into the air will fly off in multiple directions—up, down, left, and right—and then, like leaves falling off a tree, float in various directions as they settle

toward the ground.  No "Sheriff" appears between 8:15:45.367 and 8:16:34.358; the person depicted is Officer Snyder, the "hat" is her hair, and the "jacket" is her shoulders.  And finally, Officer Hafoka did in fact wear a jacket on the day of the incident, which is unremarkable given that it was a cool day.[7]  In fact, Officer Hafoka is wearing the same jacket in the body-camera video taken immediately after the incident, and Fuller does *not* contend that the body-camera video was altered.  *See* Routhe Aff. Ex. B at 0:30–0:44.

Second, altering the video would have been difficult and expensive.  This is not home-movie footage.  Instead, the video is a time-stamped security recording that was synchronized with recordings from at least six (and perhaps many more) security cameras.  To alter the video—and, in particular, to create and insert images—would have been far beyond the capacity of defendants or their attorneys.  They would have had to hire outside experts to alter the video for them.

Third, altering the video in the manner alleged by Fuller would have been unlawful.  Defendants would have risked losing their jobs, the attorneys would have risked losing their licenses to practice law, and everyone would have risked a prison

---

[7]At the time that Fuller was taken to the ground by Officer Hafoka, the temperature in St. Paul was 49 degrees.  *See* Past Weather in St. Paul, Minnesota, USA—April 2017, Timeanddate.com, https://www.timeanddate.com/weather/usa/st-paul/historic?month=4&year=2017 (last visited July 19, 2021).

term.  A defendant or an attorney would have taken an enormous risk by tampering with evidence in this manner.

Fourth, although this case is understandably very important for Fuller, it is a routine excessive-force case for defendants.  No one was killed; no one suffered life-threatening injuries; no one had to be hospitalized.  No officer discharged a firearm or even used a taser or a baton.  An officer tackled a detainee, they fell awkwardly, and the detainee fractured his ankle in the fall.  There is no reason to believe that a jury will return a particularly large verdict in this case.  It makes no sense for defendants to spend a lot of money and risk their livelihoods and freedom to fabricate evidence in what is (for them) a routine case that has little prospect of resulting in a large damage award.

Fifth, defendants have no financial stake in this case.  If a jury does hold a defendant liable and award damages to Fuller, those damages will be paid either by Ramsey County or an insurance company.  None of the individual defendants will have to pay a penny out of their own pockets.  And, of course, none of the attorneys for the defendants is at risk of paying anything to Fuller.  Defendants and their counsel have no reason to commit an expensive, difficult, and risky crime by tampering with evidence in order to save money for the County or its insurer.

And finally, if defendants were going to spend a lot of money and risk their careers and freedom in order to alter video in a routine case in which they have no personal stake, wouldn't they do a better job than this?  What possible reason would defendants have for inserting a sheriff with a hat or putting a jacket on Officer Hafoka, which would not help their defense in the slightest and which would only call attention to the fact that they had tampered with evidence?  Why would defendants bother to put a jacket on Officer Hafoka, but not put a weapon in Fuller's hand?  Why would defendants insert a single murky frame of Fuller raising his arms; why would they not instead insert several clear frames of Fuller throwing a punch at Officer Hafoka or throwing items directly at the officers?  In short, why would defendants go through all of this trouble, expense, and risk to manufacture a video *that supports Fuller's version of events*?

For these reasons, the Court does not believe that the video was altered or that a reasonable jury could find that the video was altered.  As a result, the Court will rely on the video in ruling on the pending motions.  The Court also denies Fuller's "Motion for Spoliation & Perjury," ECF No. 149, which is based on his allegation that the video was altered and on his complaints about the type of routine inconsistencies in testimony that arise in every case.

*C.  Escort to the Cell*

-18-

After Fuller was handcuffed, Officers Hafoka and Dualeh lifted him to his feet and escorted him into his cell.  Davy Aff. Ex. D at 8:16:48.506–8:17:01.856.  Sergeants Rob Erickson and Steven Routhe, and Officer Devin Sullivan[8] arrived, responding to a call for assistance.[9]  *Id.* at 8:17:03.906–8:17:22.106; Erickson Aff. ¶ 3 & Ex. A; Routhe Aff. ¶¶ 3–4 & Ex. A; Sullivan Aff. ¶ 2.  Fuller was then escorted from his cell to a disciplinary-segregation cell in a different part of the ADC.  Routhe Aff. ¶ 5.

The walk to the disciplinary-segregation cell was recorded on Sergeant Routhe's body camera.  *Id.* Ex. B.  (Unlike the security camera that recorded the incident, Sergeant Routhe's body camera recorded audio as well as video.)  Fuller walked on his own but with a limp, asked for the nurse, and said his ankle was broken.  *See id.* at 0:32–0:39; Dualeh Aff. ¶ 16; Erickson Aff. ¶ 4 & Ex. A; Davy Aff. Ex. D at 8:17:34.056–8:17:56.706.  Sergeant Erickson told Fuller that the nurse would come to his new cell.  Erickson Aff. ¶ 4 & Ex. A; Routhe Aff. Ex. B at 0:32–0:35, 1:45–1:50.  Fuller and the staff also discussed the incident.  Fuller denied touching Officer Hafoka; Officer Hafoka responded that

---

[8]Defendants refer to Devin Sullivan as an officer, ECF No. 124 at 8, as does Fuller's amended complaint, ECF No. 7 at 8.  Sullivan's affidavit says says he is currently a sergeant, but it does not indicate if he held that title on the date of the incident.  Sullivan Aff. ¶ 1.  Fuller's memorandum refers to Sullivan as a sergeant.  ECF No. 151 at 13.  The Court will defer to the amended complaint and refer to Sullivan as an officer.  But, even if Sullivan was a sergeant, the failure-to-intervene and failure-to-train claims against him would still fail.

[9]Four staff arrived after Fuller was restrained; the identity of the fourth officer is unclear.  Davy Aff. Ex. D at 8:17:03.906–8:17:22.106.

Fuller was "throwing shit" and he did not want to be hit by it. Routhe Aff. Ex. B

at 0:37–0:44. Fuller admitted to throwing papers, but maintained that he threw them

"in the opposite direction" of the officers, and insisted that Officer Hafoka "snatched"

him. *Id*. at 2:02–2:30. After Fuller reached the new cell, he was strip searched and given

a new uniform. Routhe Aff. ¶ 6.

### D.  Medical Care and Disciplinary Hearing

According to ADC records, a nurse examined Fuller at 11:40 am on April 14,

2017—about three-and-one-half hours after the incident. Mangine Aff. ¶ 4 & Ex. A at 1.

The nurse wrote that Fuller's ankle was swollen, cool to the touch, and normal in color,

and that Fuller's forehead had a lump the size of a 50-cent piece. *Id*. Ex. A at 1. The

same day, a nurse gave Fuller an ice pack and Ibuprofen, and instructed him to elevate

his ankle. *Id*. at 1, 5. Fuller, however, denies that any nurse saw him on the day of the

incident and claims that the ADC records are fabricated. *See* ECF No. 151 at 14–15.

On April 15, 2017, a nurse examined Fuller at 10:30 am, and found his left ankle

swollen with very limited mobility. Mangine Aff. ¶ 5 & Ex. A at 5. Two hours later, an

xray was taken of Fuller's ankle and knee. *Id*. The results, which were reported to the

ADC on April 17, 2017, showed that Fuller "had a nondisplaced fracture in the left

distal fibula with soft swelling of the lateral malleolar." *Id*. ¶ 6; *see also id*. Ex. A at 7.

Fuller was provided with crutches on that day. *Id*. ¶ 6 & Ex. A at 9.

Two disciplinary hearings were also held on April 17, 2017.  The hearings covered both the April 14 incident and an unrelated incident that had occurred on April 12.  Routhe Aff. ¶ 8.  Sergeant Routhe conducted the hearings, found that Fuller had committed infractions, and sanctioned Fuller by ordering him to spend 20 days in the disciplinary-segregation unit for the April 12 incident and 20 more days for the April 14 incident.  *Id.* ¶¶ 9–13.  As a result, Fuller remained in disciplinary segregation until he was released from the ADC on May 5,[10] 2017.  Davy Aff. ¶ 10.

On April 18, 2017—while he was still detained at the ADC—Fuller was taken to an orthopedist at HealthPartners Orthopedic Clinic.  Mangine Aff. ¶ 7.  The doctor diagnosed Fuller with a "nondisplaced fracture in the left distal fibula and [a] left knee contusion."  *Id.*; *see also id.* Ex. A at 10.  Fuller disputes the doctor's diagnosis of his injuries.  Fuller insists—without any medical evidence—that he had a broken ankle, fractured knee, concussion, and permanent tissue damage.[11]  ECF No. 151 at 5, 14.  The doctor put Fuller in a plaster cast and instructed him not to put weight on his leg.  Mangine Aff. ¶ 7 & Ex. A at 10–16.  A follow-up appointment was scheduled for May 2,

---

[10]The Davy Affidavit states that Fuller was released on May 7, 2017.  Davy Aff. ¶ 10.  That is incorrect.  *See id.* Ex. B at 1; Routhe Aff. ¶ 14.

[11]Fuller alleged in his amended complaint that he had a broken ankle, chipped or bruised knee bone, an infection, two swollen lymph nodes in his left thigh, tissue damage, and a concussion.  It appears that Fuller abandoned the allegations about an infection and swollen lymph nodes in his subsequent briefs.  In any event, there is no medical evidence in the record indicating that Fuller sustained such injuries.

2017.  *Id.* ¶ 8 & Ex. A at 5.  At the follow-up appointment, the doctor instructed Fuller to

continue to keep weight off his leg and to return in two weeks.  *Id.* ¶ 8 & Ex. A at 22–27.

Another follow-up appointment was scheduled for May 16, 2017, but Fuller was

released from the ADC on May 5, 2017.  *Id.* ¶¶ 9–10 & Ex. A at 21.  This lawsuit

followed.

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255.

### B.  *Official-Capacity Claims*

Fuller brings official-capacity claims against all defendants.  Official-capacity

claims against the ADC officers are, in fact, claims against Ramsey County.  *See Parrish*

*v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) ("[A] suit against a public official in his official

capacity is actually a suit against the entity for which the official is an agent." (citation

and quotation marks omitted)).  "Official-capacity liability under 42 U.S.C. § 1983

occurs only when a constitutional injury is caused by a government's policy or custom

. . . ." *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014) (citation and quotation

marks omitted).  To succeed on his official-capacity claims, then, Fuller must identify an

unconstitutional policy or custom, and then he must prove that his injury was caused

by that unconstitutional policy or custom.  *See Russell v. Hennepin County*, 420 F.3d 841,

848 (8th Cir. 2005); *Williams-El v. Johnson*, 872 F.2d 224, 230 (8th Cir. 1989).

Fuller has done just the opposite.  Although Fuller has identified a policy

(Ramsey County's use-of-force policy[12]), he does not claim that the policy is

unconstitutional, nor does he claim that the policy caused his injury.  To the contrary,

Fuller argues that the defendant officers *violated* the policy, and that it was their *violation*

of the policy that caused his injury.  As the Eighth Circuit has explained:  "We cannot

see how officials' deviation from established policy itself constitutes official municipal

policy.  If it did, the concept of official municipal policy would be turned on its head."

*Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016).

---

[12]Fuller cites Policy 498, which was not in place on April 14, 2017.  ECF No. 7 at 7;
ECF No. 124 at 13 n.7.  The Court instead refers to the use-of-force policy that was in
place on that date.  Davy Aff. ¶ 16 & Ex. E.

-23-

Fuller might be able to satisfy his burden if he had evidence that the employees of the ADC had a custom of violating the use-of-force policy. But Fuller has no such evidence. The only purported violation of the policy that he has cited is the April 14 incident itself. "[A] single deviation from a written, official policy does not prove a conflicting custom or usage." *Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir. 1991) (rejecting official-capacity claims when the only policy identified was a use-of-force policy, plaintiffs argued that defendants deviated from the policy but did not contend the policy was constitutionally deficient, and plaintiffs had no evidence of deviations from the policy outside of their own incident); *see also McReynolds v. Schmidli*, No. 19-3772, 2021 WL 2932508, at *6 (8th Cir. July 13, 2021) (two incidents of excessive force by same officer were inadequate to establish an "unofficial custom authorizing officers to use excessive force in effectuating arrests" for purposes of *Monell* claim); *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) ("[I]n the face of an express municipal policy prohibiting excessive force, two incidents of excessive force—even assumed to be true—cannot be considered a pattern of widespread and pervasive unconstitutional conduct."); *Russell*, 420 F.3d at 849 ("[A] single instance of failing to follow official policy is insufficient to establish a custom of violating the policy."); *Williams-El*, 872 F.2d at 230 ("This single occurrence does not prove the existence of a custom or usage in conflict with the official policy . . . .").

-24-

Because Fuller has not identified a link between a policy or custom and the alleged violation of his rights, the Court grants summary judgment to defendants on all official-capacity claims.

### C. Individual-Capacity Claims

#### 1. Qualified Immunity

Fuller next raises several individual-capacity claims. Defendants contend that all of Fuller's claims are barred by the doctrine of qualified immunity.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Smith v. Conway County*, 759 F.3d 853, 858 (8th Cir. 2014) (citation, quotation marks, and alterations omitted). The second "asks whether the right in question was clearly established at the time of the violation." *Id.* (citation and quotation marks omitted).

"A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The inquiry into whether a right is clearly established is not done "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), as "[t]he

dispositive question is whether the violative nature of *particular* conduct is clearly

established," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation and quotation

marks omitted).  Although there need not "be a case directly on point, existing

precedent must place the lawfulness of the particular action beyond debate."  *City of*

*Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (per curiam) (citation, quotation marks,

and alteration omitted).

Fuller can show that a right was clearly established in one of three ways:  He can

(1) identify "existing circuit precedent that involves sufficiently similar facts to squarely

govern the officer's actions such that the officer had notice that his specific use of force

was unlawful"; (2) "present a robust consensus of cases of persuasive authority doing

the same"; or (3) "demonstrate that a general constitutional rule applied with obvious

clarity to the facts at issue."  *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020)

(citations, quotation marks, and alterations omitted); *see also Quraishi v. St. Charles*

*County*, 986 F.3d 831, 835 (8th Cir. 2021) ("There may also be the rare obvious case

where the unlawfulness of the officer's conduct is sufficiently clear even though existing

precedent does not address similar circumstances." (citation and quotation marks

omitted)).

Qualified immunity creates an "exacting standard" that protects "all but the

plainly incompetent or those who knowingly violate the law" by giving "government

-26-

officials breathing room to make reasonable but mistaken judgments." *City of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (citation and quotation marks omitted). The Court now turns to Fuller's excessive-force claim.

### 2.   Excessive Force

Fuller argues that Officer Hafoka used excessive force in taking him down and holding him in a chokehold for 30 seconds while on the ground.[13] Because Fuller was a pretrial detainee, his excessive-force claim is evaluated under the Due Process Clause of the Fourteenth Amendment, which "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).

*Kingsley*'s objective-reasonableness standard must not be applied "mechanically." *Id.* at 397; *see also Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2242 (2021) (per curiam) (emphasizing the importance of considering all relevant facts surrounding an excessive-force incident and explaining that excessive-force cases require "careful, context-specific analysis"). Instead, a court must adopt "the

---

[13]In their brief, defendants argue that the force used by Officers Dualeh and Snyder was reasonable. But Fuller has not pleaded an excessive-force claim against either of those defendants in his amended complaint.

-27-

perspective of a reasonable officer on the scene" and base its analysis on "what the

officer knew at the time," without "the 20/20 vision of hindsight." *Kingsley*, 576 U.S.

at 397. In evaluating the reasonableness of a use of force, a court should consider:

> the relationship between the need for the use of force and
> the amount of force used; the extent of the plaintiff's injury;
> any effort made by the officer to temper or to limit the
> amount of force; the severity of the security problem at
> issue; the threat reasonably perceived by the officer; and
> whether the plaintiff was actively resisting.

*Id.* This list of factors is not exclusive, however, and a court must consider any other

relevant circumstances. *Id.* Finally, a court must defer to the judgment of jail officials

about what is necessary to maintain institutional order and security. *Id.*

### a. The Takedown

### i. Violation of a Federal Right

The Court will begin with Officer Hafoka's takedown of Fuller, putting aside for

the moment Officer Hafoka's use of a chokehold to restrain Fuller while he was on the

ground.[14] As it must, the Court will accept as true Fuller's version of events—which, as

the Court has noted, is substantially corroborated by the video. According to Fuller, he

---

[14]*See Jackson v. Stair*, 944 F.3d 704, 712 (8th Cir. 2019) (finding district court erred when it did not analyze each tasing of the plaintiff by the same officer separately); *Kasiah v. Crowd Sys., Inc.*, 915 F.3d 1179, 1183–85 (8th Cir. 2019) (separately analyzing three uses of force by the same officer against the same plaintiff); *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (evaluating uses of force against a pretrial detainee "both individually and in combination").

was complying with the last directive given to him—that is, the directive to return to his cell—at the time that he was taken to the ground.  The officers never warned Fuller to stop throwing things or ordered him to do (or not to do) anything else before the takedown.  Fuller made no verbal or physical threats.  And, although Fuller threw a hygiene kit and papers, he aimed nothing at the officers, and he never turned to face the officers.  On Fuller's account, then, he was an agitated but compliant pretrial detainee who threw personal belongings, but who did not throw anything toward any other person or physically or verbally threaten any other person.  Applying the *Kingsley* factors to Fuller's version of the facts, the Court finds that Officer Hafoka used excessive force in violation of the Due Process Clause.

First, the amount of force used was disproportionate to the need for force. Although Fuller was agitated and had thrown objects, he had not verbally or physically threatened the officers nor thrown the objects in their direction.  He was complying with Officer Hafoka's last directive (to return to his cell) and was empty-handed at the moment of the takedown.  There was little or no need for force.  By contrast, the force used—a violent takedown without warning—was substantial.  *Cf. Burrows v. Grossheim*, 60 F.3d 830, at *2 (8th Cir. 1995) (per curiam) (unpublished table decision) (approaching inmate from behind, grabbing him by the neck, and choking him was excessive and unnecessary when inmate had a "bad attitude" and was not at his work assignment, but

officer did not order inmate to begin working before using force or perceive inmate as a threat); *Hickey v. Reeder*, 12 F.3d 754, 758 (8th Cir. 1993) ("[t]he relationship between the need for force (zero) and the force used (a painful and incapacitating shock) was excessive" when inmate was tased for refusing to sweep cell but was not physically threatening officers). This factor weighs in favor of Fuller.

Second, Fuller suffered significant injuries. It is undisputed that Fuller fractured his ankle, suffered at least a contusion to his knee, and had a lump on his forehead the size of a 50-cent piece.[15] *See Fischer v. Hoven*, 925 F.3d 986, 989 (8th Cir. 2019) (broken hand, arm, nose, and tooth, and a facial cut were "serious injuries"). This factor, again, weighs in favor of Fuller.

Third, Officer Hafoka made no effort to temper the amount of force used. The use-of-force policy in place at the ADC on April 14, 2017, provided that an officer may use force "[s]hould verbal commands be ineffective." Davy Aff. Ex. E at 2. But on Fuller's version of events, Officer Hafoka did not even attempt to use verbal commands before taking him to the ground. Fuller was complying with the last verbal directive that he had received—to return to his cell—and Officer Hafoka gave no new commands

---

[15]Defendants argue that the injuries were caused by the "awkward" position of Fuller's leg, and not by the force applied by Officer Hafoka. Even if true, this argument does not undermine Fuller's contention that Officer Hafoka slammed Fuller onto the concrete floor and landed on top of him, which is still a high degree of force capable of producing injury (such as the large lump on Fuller's forehead) even if Fuller's leg had not been in an "awkward" position.

or warnings before the takedown.[16] *See Treats v. Morgan*, 308 F.3d 868, 874 (8th Cir.

2002) ("The use of force here would have been tempered if [the officer] had followed the

[correctional facility's] regulation requiring him to warn [the inmate] before spraying

him with capstun, giving him another chance to comply.").

Moreover, Officer Hafoka did not first attempt to restrain Fuller in a less forceful

manner, despite the use-of-force policy's directive that officers should "us[e] the least

amount of force necessary to control the situation." Davy Aff. Ex. E at 2. Instead,

Officer Hafoka approached Fuller from behind and violently slammed him to the

ground without warning. *See Martinez v. Fields*, 627 F. App'x 573, 575 (8th Cir. 2015)

(per curiam) (finding jury issue on excessive-force claim when non-English-speaking

inmate was slammed into wall after pressing call button despite order not to, and

officer did not explain why he used physical force "as opposed to using a lower level of

intervention for an uncooperative detainee as outlined in [the facility's] use-of-force

policy"). This factor also supports Fuller's excessive-force claim.

Fourth, the severity of the security problem was minimal. The incident was

precipitated by Fuller abusing the panic button, arguing over the intercom with Officer

Kuseske, and refusing to return to his cell. None of these actions harmed or threatened

---

[16]Officer Hafoka says that he warned Fuller to stop throwing items. Fuller
disagrees. The video is inconclusive, and so a reasonable jury could credit either
version of events. For the purposes of evaluating defendants' motion for summary
judgment, however, the Court must draw inferences in favor of Fuller.

to harm any person or gave rise to an immediate threat to institutional security. As events progressed, the severity of the security problem remained minimal. Fuller complied with the order to return to his cell, did not turn around, did not throw things at the officers or anyone else, and did not verbally or physically threaten anyone. In addition, because the parties were located in an enclosed area that was not accessible to the general population, there was little risk that other detainees would become involved. (Only one other detainee appears on camera during the incident; he is outside of the glassed-in area and displays no interest in the takedown of Fuller.) Fuller continued to pose no immediate threat to the officers or to the broader security of the ADC before the takedown. This factor, again, favors Fuller.

Fifth, the threat *reasonably* perceived by Officer Hafoka was minimal. At the time of the takedown, Fuller was complying with directives, was not verbally or physically threatening, had not turned around, and had nothing left in his hands. The perceived threat was further diminished by the fact that Officer Hafoka was several steps behind Fuller (and thus out of arm's reach) and closely followed by two other officers. Officer Hafoka was not alone or outnumbered, and he knew that he could receive immediate assistance from two other officers if needed. *Cf. Fischer*, 925 F.3d at 989 (noting officer reasonably thought arrestee was a threat when he was "the only officer on the scene with two hostile, intoxicated individuals"); *Brown v. City of Golden Valley*, 574 F.3d 491,

498 (8th Cir. 2009) (mentioning number of officers on the scene when evaluating threat

posed by arrestee).

True, Fuller threw papers or paper towels immediately before he was taken

down.  But when Fuller had thrown the hygiene kit a few seconds earlier, none of the

officers reacted.  The absence of any reaction indicates that the officers did not interpret

this sort of behavior to be a serious threat.  *Cf. Hickey*, 12 F.3d at 757 (rejecting argument

that use of taser was necessary to respond to an agitated and cursing inmate, when

inmate's agitation and cursing continued after he was tased and officers made no efforts

to calm or restrain the inmate).  In between throwing the hygiene kit (prompting no

reaction) and throwing the papers (prompting a violent takedown without warning),

Fuller walked toward his cell, raised his right arm once, and pivoted his torso to throw

the papers.[17]  This hardly seems like an escalation of the threat.

In fact, Officer Hafoka stated in his affidavit that he decided to take Fuller down

not because Fuller threw things, but because Fuller "squared off toward [Officer

Hafoka] with his arms in the air and fists clenched."  Hafoka Aff. ¶ 9.  But the video

---

[17]Defendants dispute this characterization, argue that Fuller was verbally and
physically aggressive, and point to the affidavits stating that Fuller violently swung his
arms and argued while walking.  Fuller denies violently swinging his arms or making
any verbal or physical threats.  The video is inconclusive, as it does not have audio, and
as it just shows Fuller briefly raising his right arm.  A jury could therefore credit either
characterization of events.  Again, for the purposes of evaluating defendants' motion,
the Court must draw inferences in favor of Fuller.

(viewed in the light most favorable to Fuller) shows that Fuller did no such thing.  On

Fuller's version of events, Officer Hafoka's statement was mistaken, dishonest, or based

on an unreasonable perception of events.[18]  Even if Officer Hafoka thought that Fuller's

conduct was escalating and the threat was growing, he took no efforts to de-escalate the

situation before resorting to force.  *See Tatum v. Robinson*, 858 F.3d 544, 548–49 (8th Cir.

2017) ("Here, a reasonable officer might have thought that [arrestee's] angry arguing

could eventually escalate to physical violence.  But a reasonable officer would not think

[arrestee]—who was angrily arguing but made no verbal threats or physical movements

indicating a threat—posed an 'immediate' safety threat.").  Of course, officers are "not

required in all cases to wait until they are attacked before they resort to force," *McCrary-*

*El v. Shaw*, 992 F.2d 809, 812 (8th Cir. 1993), but the Court cannot conclude, based on

---

[18]If Officer Hafoka's mistaken belief that Fuller turned to face and threaten him was reasonable, then Officer Hafoka would have been justified in immediately applying physical force against Fuller.  *Cf. Kingsley*, 576 U.S. at 397 (courts must not view uses of force "with the 20/20 vision of hindsight"); *Garcia v. City of New Hope*, 984 F.3d 655, 665 (8th Cir. 2021) (noting officer is entitled to qualified immunity if he "'act[s] upon a mistake of fact that is objectively reasonable'" under Fourth Amendment standard (citation omitted)).  Drawing inferences in favor of Fuller, however, the Court cannot conclude that Officer Hafoka's mistaken perception that Fuller turned around was reasonable.  First, the video shows that Fuller pivoted but did not turn.  *See Quraishi*, 986 F.3d at 836 ("A court may consider other evidence [aside from the officer's testimony] to determine what a reasonable officer would have perceived.").  Second, the incident reports and affidavits of the other officers do not mention Fuller turning, meaning that two other officers on the scene (Dualeh and Snyder) and a third officer watching the events from the control room (Kuseske) did not perceive Fuller as turning to face Officer Hafoka.  And third, Officer Hafoka's affidavit and incident report are inconsistent with each other.

Fuller's version of events, that Officer Hafoka could have reasonably believed that Fuller posed an immediate threat.

Sixth and finally, Fuller was not actively resisting.  Defendants argue that the incident was precipitated by Fuller's abuse of the panic button and his refusal to follow Officer Kuseske's orders.  That is true, but that is only part of the story.  After Fuller and Officer Hafoka talked, Fuller was told to return to his cell, and he was in the process of *complying* with that order when he was taken down.  *Cf. McReynolds*, 2021 WL 2932508, at *3 (arrestee's delay in complying with orders to get on the ground was "immaterial to the excessive force analysis" because arrestee ultimately complied and the "alleged noncompliance ended well before the tackle").

To summarize:  If Fuller's version of events is true—as the Court must assume for purposes of ruling on defendants' summary-judgment motion—all six of the *Kingsley* factors indicate that the takedown was not objectively reasonable.  It does not appear that "security concerns [were] . . . immediately implicated" or that "force [was] used as a reasonable last resort to preserve discipline."  *Smith*, 759 F.3d at 860 (citations and quotation marks omitted).  Instead, it appears that Officer Hafoka simply lost his temper at a detainee who had gotten under his skin.  *See Treats*, 308 F.3d at 872 ("The law recognizes that order and discipline are important in running a correctional institution, but that does not authorize the arbitrary use of force, nor does it justify

punitive use of force on difficult inmates not posing a real threat to other persons or

raising security concerns." (internal citation omitted)); *Hickey*, 12 F.3d at 759 ("[F]orce in

response to [a] provocative act which due to its timing does not implicate order and

security of [an] institution is likely retaliatory rather than a good faith effort to maintain

order[.]" (citation omitted)).

For these reasons, the Court holds that, on Fuller's version of events, Officer

Hafoka's takedown of Fuller violated Fuller's constitutional right to be free of excessive

force.[19]   *See McReynolds*, 2021 WL 2932508, at *3 (holding "the use of significant force

---

[19]The cases cited by defendants are not to the contrary.  In *Parrish v. Dingman*, 912 F.3d 464, 468 (8th Cir. 2019), an arrestee was escorted into his holding cell while holding a mattress.  The arrestee asked for a different cell, the officer declined, and the arrestee stepped towards him, sticking the mattress through the cell door.  The officer responded by forcing the arrestee into a wall and then leveraging him to the ground. The Eighth Circuit held that the officer's actions were reasonable because a "reasonable officer could believe [the arrestee] was trying to leave the holding cell, justifying force to maintain order and security in the jail."  *Id.*  The mattress prevented the officer from simply closing the door and posed a safety risk as it could be used as a shield.  Here, Fuller was in a contained area, was complying with the latest order, did not step towards an officer, and was empty-handed when taken down.

*Hicks v. Norwood*, 640 F.3d 839, 842 (8th Cir. 2011), considered the use of an arm-bar maneuver against an arrestee who "refused to comply with directions, loudly abused the correctional officers, and aggressively leapt toward" an officer during booking.  The use of force was found to be objectively reasonable because a reasonable officer would believe that the arrestee was a threat.  Here, Fuller did not leap towards Officer Hafoka or anyone else and was complying with instructions.

In *Hosea v. City of St. Paul*, 867 F.3d 949 (8th Cir. 2017), an arrestee suspected of domestic assault was tackled by officers after he initially refused to comply with

(continued...)

-36-

against" a suspect who was "compliant and neither a threat nor a flight risk" was "not

objectively reasonable").

## ii. Clearly Established

The Court now turns to the question of whether it was clearly established on

April 14, 2017, that a pretrial detainee in Fuller's situation—that is, a pretrial detainee

who was agitated but who was complying with the last directive that he had been given

---

[19](...continued)
directives to get on the ground. The use of force was found to be reasonable because
"an alleged domestic violence victim was within reach of Hosea, Hosea had only
reluctantly begun to partially comply with the orders, and the situation remained fluid
and dangerous." *Neal v. Ficcadenti*, 895 F.3d 576, 582 (8th Cir. 2018). In this case, no one
was at risk of being harmed by Fuller, he was complying with the last directive that he
had received, and the situation could not reasonably be characterized as "dangerous."

Defendants cite *Blazek v. City of Iowa City*, 761 F.3d 920 (8th Cir. 2014), but the
relevant holding is actually found in *Wertish v. Krueger*, 433 F.3d 1062, 1067 (8th Cir.
2006). *Wertish* held that the force used to handcuff an arrestee was reasonable when he
refused to get out of his vehicle, free his hands, or stand, and when he suffered only *de
minimis* injuries. In contrast, Fuller was compliant and suffered serious injuries.

Defendants also rely on two district-court cases from Arkansas. In *Clayton v.
Ridgell*, pepper spraying an inmate was held not to violate the Eighth Amendment
because the inmate did not comply with orders and received several warnings.
No. 5:16-cv-00168-JM-JJV, 2016 WL 4257190, at *3 (E.D. Ark. Aug. 4, 2016), *report &
recommendation adopted sub nom. May v. Ridgell*, 2016 WL 4259993 (E.D. Ark. Aug. 11,
2016). By contrast, Fuller was compliant and was not warned. Unlike the plaintiff in
*Clayton*, Fuller had no opportunity to "follow[] . . . instructions and avoid[] the use of
force." *Id.* And, in *London v. Sanders*, pepper spraying a non-threatening inmate was
found justified because he refused to comply with orders. No. 5:14CV00106-KGB-JJV,
2015 WL 7733456, at *2 (E.D. Ark. Mar. 19, 2015), *report & recommendation adopted*, 2015
WL 7738005 (E.D. Ark. Nov. 30, 2015). Here, Fuller was complying with the last order
that he had received.

and who did not pose an immediate threat to himself or others—had a constitutional right not to be violently taken to the ground without any warning.  The Court cannot find (and the parties have not cited) a case on all fours with this case.  But "officers cannot escape suit merely because no prior case involved exactly the same facts as alleged by the plaintiff."  *Williams v. Jackson*, 600 F.3d 1007, 1013 (8th Cir. 2010); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").  "[T]here is no requirement that [the plaintiff] must find a case where the very action in question has previously been held unlawful, so long as existing precedent [has] placed the statutory or constitutional question beyond debate."  *Karels v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018) (internal citations and quotation marks omitted).

Eighth Circuit precedent had clearly established by April 14, 2017, that using force without warning against a compliant pretrial detainee who was agitated but not posing an immediate safety or security threat violated the Due Process Clause.  In *Smith*, a pretrial detainee yelled that he was in pain and then became violent and did not comply with orders after officers came to assist him.  759 F.3d at 860–61.  He was tased once, fell to the ground, and was tased a second time before he could comply with orders.  The Eighth Circuit concluded that the second tasing was excessive because the detainee was "no longer acting aggressively," because the detainee was in pain and

therefore was no longer a threat, and because the detainee was "attempting to comply"

with orders.  *Id.*  Fuller and the detainee in *Smith* are similar in a number of respects:

Both were agitated, both were attempting to comply with orders, and neither posed an

immediate threat.  *Smith* held that officers may not use force on detainees when "[n]o

'security concern' or disciplinary necessity is apparent," putting Officer Hafoka on

notice of the illegality of his conduct toward Fuller.  *Id.* at 861; *see also Edwards v. Byrd*,

750 F.3d 728, 732 (8th Cir. 2014) ("inflicting unjustified harm on" a pretrial detainee is

unconstitutional when it is not needed "to restore order or discipline").

Fourth Amendment cases are also instructive.  The Fourth Amendment protects

arrestees from excessive force in the same way that the Fourteenth Amendment protects

pretrial detainees from excessive force, and excessive-force claims under the Fourth

Amendment are governed by the same objective-reasonableness standard as excessive-

force claims under the Fourteenth Amendment.  *See Patel v. Lanier County*, 969 F.3d

1173, 1182 (11th Cir. 2020) ("After *Kingsley*, the Fourteenth Amendment's standard is

analogous to the Fourth Amendment's.").  Fourth Amendment excessive-force cases

had clearly established by April 14, 2017, that a violent takedown or similar maneuver

could not be employed against a nonviolent, nonthreatening arrestee who was not

attempting to flee.  *See McReynolds*, 2021 WL 2932508, at *4 ("[A] reasonable officer

would have had fair warning that, in June 2012, he could not violently takedown a

person who was not threatening anyone, not actively resisting arrest, and not attempting to flee."); *MacKintrush v. Pulaski Cnty. Sheriff's Dep't*, 987 F.3d 767, 770–71 (8th Cir. 2021) (determining it was clearly established in April 2015 that an officer violated constitutional rights by body-slamming arrestee to the floor, after an agitated arrestee shrugged off the officer's hand from his shoulder but was not violent or threatening); *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018) (concluding that in April 2015, "every reasonable official would have understood that he could not throw . . . a nonviolent, nonthreatening misdemeanant who was not actively resisting—face-first to the ground"); *Rohrbough v. Hall*, 586 F.3d 582, 586–87 (8th Cir. 2009) (finding officer was not entitled to qualified immunity when he punched and took down arrestee who had turned with arms raised to greet officer and returned a push from the officer).

Fuller's claim is also supported by cases interpreting the Eighth Amendment, which protects prisoners from cruel and unusual punishment. Excessive-force claims under the Eighth Amendment are analyzed somewhat differently from excessive-force claims under the Fourth and Fourteenth Amendments.[20] But in deciding whether a

---

[20]The Fourth and Fourteenth Amendments prohibit force that is objectively unreasonable, *Kingsley*, 576 U.S. at 396–97; *Graham*, 490 U.S. at 397, while the Eighth Amendment prohibits force used "maliciously and sadistically to cause harm," *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The core difference between these tests is the consideration of the officer's subjective intent. Under the Eighth Amendment's malicious-and-sadistic standard, "the subjective motivations of the individual officers are of central importance in deciding whether force used" was excessive. *Graham*, 490

(continued...)

defendant in an excessive-force case brought under the Fourth or Fourteenth

Amendments has qualified immunity—and, in particular, in deciding whether the

plaintiff's right to be free from the challenged application of force was clearly

established—the Eighth Circuit has nevertheless consulted Eighth Amendment case

law.  *See, e.g.*, *Brown*, 574 F.3d at 499–500 (considering a Fourth Amendment excessive-

force claim but drawing on Eighth Amendment precedent when evaluating the clearly-

established prong of the qualified-immunity inquiry).

The Eighth Circuit's decisions under the Eighth Amendment support the

conclusion that Fuller's right to be free from the force applied by Officer Hafoka was

clearly established on April 14, 2017.  In *Treats*, for example, the Eighth Circuit

considered an excessive-force claim brought by an inmate who had been pepper

sprayed without warning after refusing to comply with an order.  The court explained

that "the law was clearly established that correctional officers do not have a blank check

to use force whenever a prisoner is being difficult."  *Treats*, 308 F.3d at 875.  Although

correctional officers may use force "to make an inmate comply with a lawful prison

---

[20](...continued)
U.S. at 398.  By contrast, "[t]he officer's subjective intent . . . is irrelevant under the
Fourteenth Amendment," *Fisherman v. McGriff*, 17-CV-2320 (PJS/ECW), 2020 WL
1330176, at *3 (D. Minn. Mar. 23, 2020), *aff'd*, 832 F. App'x 454 (8th Cir. 2020) (per
curiam), and under the Fourth Amendment, *Graham*, 490 U.S. at 397–99.

regulation or order," the Eighth Circuit concluded that correctional officers may do so only when "the inmate's noncompliance also poses a threat to other persons or to prison security." *Id.* Similarly, *Hickey* established that "summary force" was not a constitutional "method of discipline where security concerns are not immediately implicated." 12 F.3d at 759. Like the inmates in *Treats* and *Hickey*, Fuller was being difficult, but his behavior did not pose an immediate security concern.

"'[I]n the light of pre-existing law,'" then, "'the unlawfulness [of Officer Hafoka's conduct was] apparent.'" *Morris v. Zefferi*, 601 F.3d 805, 812 (8th Cir. 2010) (quoting *Anderson*, 483 U.S. at 640). Therefore, taking Fuller's version of events as true, the Court finds that Officer Hafoka is not entitled to qualified immunity with respect to the claim that he used excessive force in taking Fuller to the ground, and thus the Court denies defendants' motion for summary judgment on this claim. *See McReynolds*, 2021 WL 2932508, at *3 ("Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate." (citation and quotation marks omitted)).

The Court likewise denies Fuller's motion for summary judgment on this claim. In considering Fuller's motion, the Court must, of course, assume that *defendants'* version of events is true—including their claims that Fuller was swinging his arms violently, that Officer Hafoka instructed Fuller to stop throwing things, that Fuller

defied that instruction when he threw his papers against the wall, and that Fuller made a threatening gesture by turning toward Officer Hafoka with his arms in the air and fists clenched.  Dualeh Aff. ¶ 11; Hafoka Aff. ¶¶ 5, 7, 9 & Ex. A; Kuseske ¶ 8; Snyder Aff. ¶ 6.  If the jury finds that defendants' version of events is true, then Officer Hafoka will be entitled to qualified immunity under the judicial decisions that the Court has already discussed.

In sum, because there are multiple disputed material facts, the Court cannot grant summary judgment to either party on Fuller's claim that Officer Hafoka used excessive force by taking him to the ground.  *See Henderson v. City of Woodbury*, 909 F.3d 933, 939–40 (8th Cir. 2018) (reversing grant of qualified immunity when there was a genuine dispute over whether arrestee complied with officer directives before the use of force).

### b.  *The 30-Second Chokehold*

Fuller also contends that Officer Hafoka held him in a chokehold for 30 seconds after he was on the ground.[21]  ECF No. 151 at 14–15.  The context of the chokehold is different from the context of the takedown, though.  In an affidavit, Officer Hafoka

---

[21]Defendants argue that there is no evidence that Fuller was placed in a chokehold.  That is not true.  At his disciplinary hearing, Fuller repeatedly stated that Officer Hafoka held him in a chokehold.  Routhe Aff. Ex. E at 7:43–8:01.  Moreover, a reasonable jury could find that the video of the incident shows that Officer Hafoka applied a chokehold on Fuller.  *See* Davy Aff. Ex. D at 8:15:45.167–8:15:45.967.

asserts that Fuller "continued to resist all directives" after the takedown, and no

evidence in the record contradicts Officer Hafoka's statement.  Hafoka Aff. ¶ 7; *see also*

Snyder Aff. ¶ 7; Dualeh Aff. ¶ 13 & Ex. A.  To the contrary, the video shows that, after

the takedown, Fuller was physically resisting efforts to place him in handcuffs.  *See, e.g.*,

Davy Aff. Ex. D at 8:15:44.367–8:15:48.017 (showing Fuller kicking his legs).  In short,

whereas Fuller was compliant *before* the takedown, *after* the takedown Fuller was

defying directives and resisting the officers' efforts to restrain him.

Having reviewed the relevant case law, the Court concludes that on April 14,

2017, it was not clearly established that a correctional officer could not use a chokehold

on a pretrial detainee who was unrestrained, who was physically resisting efforts to

restrain him, and who was refusing to comply with directives.  *See al-Kidd*, 563 U.S.

at 735 ("[L]ower courts have discretion to decide which of the two prongs of qualified-

immunity analysis to tackle first.").  Indeed, Eighth Circuit precedent at the time was

clear that a correctional officer may use force to restrain a physically resistant detainee.

*See Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017) (qualified immunity barred

excessive-force claims based on officers twice tasing and placing their body weight on a

pretrial detainee for three minutes, when the detainee was on the ground in the prone

position but was still physically resisting and ignoring directives).

Fourth Amendment case law bolsters this conclusion. *See, e.g., Brossart v. Janke*, 859 F.3d 616, 625 (8th Cir. 2017) (tasing arrestee who refused to cooperate with officers, made threats of violence, ignored commands, and physically resisted arrest did not violate clearly established law in 2011); *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1012 (8th Cir. 2017) ("[W]e have held that officers may use force to handcuff a suspect who is resisting, even if that force causes pain."); *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) ("Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing.").

As a result, qualified immunity bars Fuller's excessive-force claim as to the chokehold, and the Court grants defendants' summary-judgment motion on this claim.

### 3.  Failure to Intervene

Fuller asserts failure-to-intervene claims against Officers Dualeh and Snyder.[22] An officer may be held liable for failing to "intervene to prevent the use of excessive force when '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015)

---

[22]The amended complaint also asserts a failure-to-intervene claim against Officer Kuseske.  Officer Kuseske was in the control room during the takedown of Fuller, Kuseske Aff. ¶ 3, making it impossible for him to intervene.  The amended complaint also mentions that Officer Sullivan failed to intervene.  Officer Sullivan was in a different part of the ADC when the takedown occurred, Sullivan Aff. ¶ 2, so he, too, could not possibly have intervened.

(quoting *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009)); *see also Edwards*, 750 F.3d at 733 ("A jail official violates the Due Process Clause . . . when he is deliberately indifferent to a substantial risk of serious harm to a pre-trial detainee and fails to protect the detainee." (citation and quotation marks omitted)).[23]

Neither Officer Dualeh nor Officer Snyder can be held liable for failing to prevent Officer Hafoka's takedown of Fuller.  Officer Dualeh was several steps behind Officer Hafoka at the moment of the takedown, and Officer Snyder was several steps behind Officer Dualeh.  The takedown occurred in a split second and without warning. Neither Officer Dualeh nor Officer Snyder had an opportunity to prevent the takedown. As a result, neither can be held liable for failing to intervene.  *Cf. Smith*, 759 F.3d at 861 (qualified immunity did not apply when officer failed to intervene after the officer using force had warned detainee that he was going to deploy taser for a second time); *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009) (no qualified immunity on failure-to-intervene claim when use of excessive force on arrestee lasted five minutes, giving officers plenty of time to intervene).

---

[23]The amended complaint alleges that Sergeants Routhe and Erickson failed to intervene to provide adequate medical care.  But "outside of the excessive force context, there is no clearly established law regarding a duty to intervene to prevent constitutional violations."  *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013); *see also Livers v. Schenck*, 700 F.3d 340, 360 (8th Cir. 2012) ("We have not recognized a duty to intervene to prevent other constitutional violations.").  The Court will therefore treat the claims against Sergeants Routhe and Erickson as deliberate-indifference claims.

The Court has already held that qualified immunity bars Fuller's excessive-force claim against Officer Hafoka based on the chokehold, and thus Fuller's failure-to-intervene claims against the other officers necessarily fail. *See Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) ("Here, because it was not clearly established that [the officer's] actions constituted excessive force, a reasonable officer was not on fair notice that his failure to intervene . . . violated [the plaintiff's] Fourth Amendment rights.").

The Court therefore grants summary judgment to defendants on Fuller's failure-to-intervene claims.

### 4. Conspiracy

Fuller alleges that defendants conspired to deprive him of his constitutional rights. To succeed on his conspiracy claim, Fuller "must prove: (1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him." *Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir. 2018) (citation and quotation marks omitted). "[T]hough the question of a conspiracy . . . is usually a jury question, a court may resolve a conspiracy claim on summary judgment where it is convinced that the evidence presented is insufficient to support any

reasonable inference of a conspiracy." *Robinson v. Hawkins*, 937 F.3d 1128, 1134 (8th Cir. 2019) (citation and quotation marks omitted).

Fuller's conspiracy claim is not viable because he has introduced no evidence that defendants reached an agreement to deprive him of his constitutional rights. Fuller "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016) (citation and quotation marks omitted). Fuller has not done so. Fuller argues that there was a conspiracy because Officers Dualeh and Snyder watched Officer Hafoka take down and choke him, Officer Dualeh handcuffed him, Officer Snyder held his legs, and no nurse visited him on the day of the incident. ECF No. 151 at 4–5, 14–15. But none of this proves or even suggests that any officer had an *agreement* with any other officer. The Court therefore grants summary judgment to defendants on Fuller's conspiracy claims. *See Robinson*, 937 F.3d at 1134–35 (determining summary judgment was warranted on conspiracy claim when plaintiff had "scant evidence" to show an agreement between the officers).

### 5. Failure to Train and Supervise

Fuller also asserts failure-to-train and failure-to-supervise claims against the inferior officers (Officers Dualeh, Hafoka, Kuseske, Snyder, and Sullivan) and the superior officers (Sergeants Erickson and Routhe). Fuller's claim against the inferior

officers reflects a misunderstanding of the nature of failure-to-train and failure-to-supervise claims.  These claims allow a plaintiff to hold a *supervisor* liable for failing to train or supervise inferior officers—not to hold an *inferior officer* liable for failing to *be* trained or supervised.  Fuller's failure-to-train and failure-to-supervise claims against Officers Dualeh, Hafoka, Kuseske, Snyder, and Sullivan are therefore dismissed.

Sergeants Erickson and Routhe were superior officers, and thus they could potentially be held liable to Fuller for failing to train or supervise their inferior officers.  *See McGuire v. Cooper*, 952 F.3d 918, 922 (8th Cir. 2020) ("Even in the absence of an allegation of direct participation in a constitutional violation, a supervising officer may still face liability for an alleged failure to train and supervise subordinates."); *Parrish*, 594 F.3d at 1002 ("[A] supervisor's failure to train an inferior officer may subject the superior to § 1983 liability in his individual capacity . . . .").  A failure-to-supervise claim requires Fuller to show that Sergeants Erickson and Routhe (1) "[r]eceived notice of a pattern of unconstitutional acts committed by subordinates," (2) "[d]emonstrated deliberate indifference to or tacit authorization of the offensive acts," (3) "[f]ailed to take sufficient remedial action," and (4) "[t]hat such failure proximately caused injury to [Fuller]."  *McGuire*, 952 F.3d at 922 (citation and quotation marks omitted).  Similarly, a failure-to-train claim requires showing that (1) "the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into

contact," and (2) "the alleged failure to train actually caused the constitutional deprivation." *Id.* at 923 (citation and quotation marks omitted); *see also Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (noting failure-to-train and failure-to-supervise claims "ultimately require the same analysis").

Fuller has introduced no evidence that "a pattern of unconstitutional acts committed by subordinates" even occurred, much less that Sergeants Erickson and Routhe were aware of those unconstitutional acts, much less that they acted with deliberate indifference to those acts. Nor has Fuller introduced any evidence connecting any violation of his rights to a failure to train or supervise. *Cf. Brossart*, 859 F.3d at 627 (rejecting supervisory-liability claim based on tasings when they were the first tasings committed by the inferior officer and there were no prior complaints). Nothing in the record would allow a reasonable jury to hold either Sergeant Erickson or Sergeant Routhe liable for failing to train or supervise their subordinates.

The Court therefore grants summary judgment to defendants on Fuller's failure-to-train and failure-to-supervise claims. *See Flemons v. Devane*, 779 F. App'x 423, 424 (8th Cir. 2019) (per curiam) (affirming grant of summary judgment to defendants when "there was no evidence showing that [defendants] failed to supervise adequately the other defendants, or that they were deliberately indifferent to any inadequacies in the other defendants' training").

### 6. Failure to Conduct an After-Action Review

Fuller alleges that Sergeants Erickson and Routhe failed to conduct an after-action review following the April 14 incident in violation of Ramsey County policy.  But Ramsey County policy does not give Fuller an independent legal right to an after-action review that he can enforce in a § 1983 action.  *Cf. Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) ("[U]nder section 1983 the issue is whether the government official violated the Constitution or federal law, not whether he violated the policies of a state agency."); *Edwards v. Baer*, 863 F.2d 606, 608 (8th Cir. 1988) ("[P]olice department guidelines do not create a constitutional right.").  Moreover, Fuller has not explained how a failure to investigate the incident *after* it occurred harmed him.  *Cf. Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (noting "an inadequate investigation into the January 22 shooting could not have caused" that shooting); *Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir. 1996) ("While [police chief's] failure to investigate the [plaintiff's complaint of rape against a police officer] may have violated state law and common sense, it did not rise to the level of a separate constitutional violation of [plaintiff's] rights."); *Lollie v. Johnson*, No. 14-CV-4784 (SRN/HB), 2015 WL 3407931, at *6 (D. Minn. May 27, 2015) ("[P]ost-injury wrongful conduct cannot be the moving force behind the injury at issue." (citation and quotation marks omitted)); *Williams v. Omodt*, 640 F. Supp. 120, 124 (D. Minn. 1986) (rejecting claim based on supervisor's failure to investigate a use of

force, noting that "[w]hile a more thorough investigation of the incident on February 17 would have been preferable, [the supervisor's] failure to conduct one did not injure plaintiff or rise to the level of a constitutional violation").

For these reasons, the Court grants summary judgment to defendants on Fuller's failure-to-investigate claim.

### 7.  Deliberate Indifference

Fuller next contends that Sergeants Erickson and Routhe were deliberately indifferent to his injuries, since (according to Fuller) no nurse came to treat him on the day of the incident, and he was not taken to see an orthopedist until four days after the incident.  Fuller's deliberate-indifference claim is evaluated under the Due Process Clause of the Fourteenth Amendment.  *Ryan*, 850 F.3d at 425.  "In order to succeed on a deliberate indifference claim, a pretrial detainee must show that he 'suffered from an objectively serious medical need' and that one or more defendants 'had actual knowledge of that need but deliberately disregarded it.'"  *Id.* (quoting *Bailey v. Feltmann*, 810 F.3d 589, 593–94 (8th Cir. 2016)).[24]

The objective prong of this inquiry is generally satisfied "if the medical need in question is supported by medical evidence, such as a physician's diagnosis, or is so

---

[24]The Eighth Circuit has declined to apply the *Kingsley* objective-reasonableness standard to pretrial detainees' deliberate-indifference claims.  *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018).

obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (citation and quotation marks omitted). But when (as here) the deliberate-indifference claim is based on a delay in treatment, "the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (citation and quotation marks omitted). Fuller "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id.* (citation and quotation marks omitted); *see also Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995) (requiring plaintiff to present "verifying medical evidence" showing that defendants "ignored an acute or escalating situation or that delays adversely affected his prognosis" (citation and quotation marks omitted)).

Fuller has introduced no "verifying medical evidence" showing that his medical conditions "were detrimentally affected by the alleged inadequacies and delays."[25] *Cassady v. Lee County*, 795 F. App'x 481, 482 (8th Cir. 2020) (per curiam). For their part, defendants have introduced expert evidence confirming that any delay in treating

---

[25]A fractured bone is a serious medical injury that needs a doctor's attention, although it is debatable whether and when a layperson would have "easily recognize[d]" that Fuller's ankle had been fractured. In any event, the Eighth Circuit has held that even when the need for medical attention is obvious, a plaintiff pursuing a delayed-treatment claim must still introduce medical evidence that the delay had a detrimental effect. *See Jackson v. Riebold*, 815 F.3d 1114, 1120 (8th Cir. 2016). As noted, Fuller has introduced no such evidence.

Fuller did not detrimentally impact his condition and that waiting until April 18, 2017 to take him to a doctor was "within a normal period of time after this type of undisplaced left fibula fracture." *See* Parker Aff. Ex. A at 9–11.

The Court therefore grants summary judgment to defendants on Fuller's deliberate-indifference claims. *See Corwin v. City of Indep.*, 829 F.3d 695, 698–99 (8th Cir. 2016) (five-day delay in visit to doctor for treatment of fractured hand did not sustain deliberate-indifference claim when there was no evidence the delay had a detrimental effect); *Laughlin*, 430 F.3d at 929 (affirming grant of summary judgment on delay-based deliberate-indifference claim when inmate "offered no evidence establishing that any delay in treatment had a detrimental effect").

### 8.  Conditions of Confinement

Fuller's amended complaint asserts a conditions-of-confinement claim based on his detention for 77 days in the administrative and disciplinary-segregation units, during which Fuller was allowed outside of his cell for only one hour each day.  But Fuller appears to have abandoned this claim in his briefs, instead arguing that the ADC's system of classifying detainees by making them wear differently colored uniforms is unconstitutional.  Both claims fail.

Because Fuller was a pretrial detainee, his conditions-of-confinement claims are evaluated under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16

(1979). *Bell* established that "the government may detain defendants pretrial and may subject them to the restrictions and conditions of a detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020) (citation, quotation marks, and alterations omitted). Conditions of confinement amount to punishment when they were intentionally punitive or when they were "not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose." *Id.*

As to the segregation units: Fuller has failed to "create a genuine issue of material fact that defendants confined him to administrative segregation . . . for punitive reasons rather than for institutional security." *Whitfield v. Dicker*, 41 F. App'x 6, 7 (8th Cir. 2002) (per curiam). Fuller was placed in segregation because he repeatedly violated rules and instructions and disrupted the order and security of the ADC. Routhe Aff. Exs. C, D; Walker Aff. Ex. A. Fuller was afforded disciplinary hearings for each infraction and ADC staff regularly reviewed his placement; because he continued to behave badly, he was kept in segregation for a total of 77 days. Routhe Aff. Exs. C, D; Walker Aff. Ex. A; Davy Aff. Ex. C. The ADC's goal in confining Fuller to segregation—maintaining security—is a legitimate governmental purpose. *Bell*, 441 U.S. at 540, 546; *Putnam v. Gerloff*, 639 F.2d 415, 419 (8th Cir. 1981).

For these reasons, the Court holds that Fuller's confinement for 77 days in administrative and disciplinary segregation was constitutional.  *See Kanu v. Lindsey*, 739 F. App'x 111, 118 (3d Cir. 2018) (placing pretrial detainee in disciplinary and administrative segregation for about 70 days was constitutional when done for safety reasons); *Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 318–19 (1st Cir. 1995) (sanctioning pretrial detainee to 90 days in disciplinary segregation after he offered a bribe and attempted to escape was constitutional because it was related to legitimate interest in institutional order); *Dale v. Brott*, No. 12-CV-0383 (PJS/JSM), 2013 WL 12074952, at *12–13 (D. Minn. July 23, 2013) (confining pretrial detainee to unit outside of general population for 42 days was constitutional when confinement was due to medical issue and no-contact status with another inmate), *report & recommendation adopted*, 2013 WL 12074953 (D. Minn. Sept. 5, 2013), *aff'd*, 562 F. App'x 551 (8th Cir. 2014) (per curiam); *Snowden v. Rankin*, No. CV 07-1992, 2008 WL 508465, at *3–4 (D. Ariz. Feb. 21, 2008) (confining pretrial detainee to disciplinary segregation for nearly 90 days was constitutional when detainee failed to show the confinement was done without a legitimate governmental purpose).[26]

---

[26]Similarly, limiting Fuller's recreation time did not have an impermissible punitive purpose, followed Minnesota regulations, and presents no constitutional concern.  *See* Minn. R. 2911.3100, subp. 7(F); *Campbell v. Cauthron*, 623 F.2d 503, 507 & n.4 (8th Cir. 1980) (noting that detainees and inmates confined to their cells "for more than sixteen hours per day shall ordinarily be given the opportunity to exercise for at least

(continued...)

As to the differently colored uniforms:  Fuller asserted this claim for the first time in his brief.  Since the claim is not mentioned in the amended complaint, it is not properly before the Court, and the Court declines to consider it.[27]  *See Horde v. Elliot*, No. 17-CV-0800 (WMW/SER), 2018 WL 987683, at *17 (D. Minn. Jan. 9, 2018) (noting "it is procedurally improper to raise new issues in the briefing" on a motion for summary judgment (citing *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989))), *report & recommendation adopted*, 2018 WL 985294 (D. Minn. Feb. 20, 2018).

The Court grants summary judgment to defendants on Fuller's conditions-of-confinement claims.

### 9.  Minnesota Constitutional Claims

Fuller also invokes the Remedies Clause of the Minnesota Constitution, which provides that "[e]very person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain

---

[26](...continued)
one hour per day outside the cell"); *Bartunek v. Hall County*, No. 8:18CV489, 2020 WL 1441853, at *11 (D. Neb. Mar. 24, 2020) (confining pretrial detainee to cell for 22 hours after an inmate fight in his housing unit was constitutional), *aff'd*, 828 F. App'x 340 (8th Cir. 2020) (per curiam), *cert. denied*, 141 S. Ct. 1709 (2021).

[27]Even if the Court considered Fuller's color-classification claim, the Court would reject it on the merits.  The requirement that differently classified inmates wear differently colored uniforms is plainly not punitive.  *See Banks v. Hennessey*, No. C 11-02031 EJD (PR), 2012 WL 6725890, at *4 (N.D. Cal. Dec. 27, 2012); *King v. County of Los Angeles*, No. CV 10-6592-TJH (AGR), 2012 WL 13124276, at *1 (C.D. Cal. Oct. 3, 2012).

justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws." Minn. Const. art. I, § 8. However, "[t]here is no private cause of action for violations of the Minnesota Constitution." *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 941 (8th Cir. 2016) (citation and quotation marks omitted). Moreover, the Remedies Clause "is not a separate and independent source of legal rights." *Id.* at 942 (citation and quotation marks omitted). Rather, the clause "enjoins the legislature from eliminating those remedies that have vested at common law without a legitimate legislative purpose." *Olson v. Ford Motor Co.*, 558 N.W.2d 491, 497 (Minn. 1997) (emphasis omitted); *see also Hickman v. Grp. Health Plan, Inc.*, 396 N.W.2d 10, 14 (Minn. 1986). For these reasons, the Court grants summary judgment to defendants on Fuller's Minnesota constitutional claims.[28]

### 10. Additional Claims

Finally, Fuller raises in his briefs a number of claims that were not mentioned in his amended complaint. Specifically, Fuller alleges that his First Amendment rights were violated, that the Ramsey County District Court undertook illegal actions against him (including by detaining him pending trial), that defendants impeded his ability to file a habeas petition, that he is a victim of medical malpractice, that he was searched

---

[28]The amended complaint mentions "medical negligence," but does not name any medical professionals as defendants. Fuller also cites Minn. Stat. § 466.04, which sets tort-liability caps but does not provide an independent cause of action.

and arrested in violation of the Fourth Amendment, and that he was charged with

felonies without probable cause.  These claims are not properly before the Court, and

the Court therefore declines to consider them.  *See Horde*, 2018 WL 987683, at *17.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Plaintiff's motion to recuse [ECF No. 148] is DENIED.

2.    Plaintiff's motion for spoliation and perjury [ECF No. 149] is DENIED.

3.    Plaintiff's motion for summary judgment [ECF No. 150] is DENIED.

4.    Defendants' motion for summary judgment [ECF No. 122] is GRANTED

      IN PART and DENIED IN PART as follows:

      a.    The motion is DENIED as to plaintiff's claim that defendant Stanley

            Hafoka used excessive force in taking him to the ground.

      b.    The motion is GRANTED in all other respects, and all of plaintiff's

            other claims are DISMISSED WITH PREJUDICE.

Dated: July 19, 2021

_____

Patrick J. Schiltz

United States District Judge